Howard F. BALTENSPERGER,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. 147–L.

United States District Court
D. Nebraska.

June 30, 1959.

602

Richard N. Thompson, Cline, Williams, Wright & Johnson, Lincoln, Neb., for plaintiff.

Wm. E. Morrow, Jr., Asst. U. S. Atty., for Dist. of Nebraska, Lincoln, Neb., for defendant.

VAN PELT, District Judge.

On April 18, 1957, the plaintiff signed an agreement with the United States Department of Agriculture to withdraw seventeen acres of land from the production of corn for the year 1957. One of the conditions of the agreement was that this 17-acre "acreage reserve" was not to be grazed. In return for withdrawing this area from production, and not grazing it, plaintiff was to receive $629.

Regulations which both parties concede to be applicable provided that if the acreage reserve was grazed as a result of the "gross negligence" of the plaintiff the entire payment was to be forfeited. 6 C.F.R. § 485.286.

Payment was made to plaintiff of the $629. The Otoe County and the State ASC Committees both ruled that the land in question had been grazed as a result of plaintiff's gross negligence. The $629, plus a small amount of interest, was thereupon refunded, pursuant to the order of the State Committee.

Pursuant to Title 7 U.S.C.A. § 1831 (d), the plaintiff has brought an action in this court for a trial *de novo* of the issue: "that the State Committee erred in finding that said acreage reserve was grazed as a result of his gross negligence."

In addition to the main issue, the only other question presented relates to the burden of proof. No controlling authority was cited by either party.

■ The general rule, of course, is that the burden of proof is upon the party asserting the affirmative of the issue. But this is not a rule which settles concrete cases. As stated by Wigmore:

"The truth is that there is not and cannot be any one general solvent for all cases. It is merely a question of policy and fairness based on experience in the different situations.

\* \* \* \* \* \*

"There is, then, no one principle, or set of harmonious principles, which afford a sure and universal test for the solution of a given class of cases. The logic of the situation does not demand such a test; it would be useless to attempt to discover or to invent one; and the state of the law does not justify us in saying that it has accepted any. There are merely specific rules for specific classes of cases, resting for their ultimate basis upon broad reasons of experience and fairness."
IX Wigmore, Evidence, § 2486 (1940 ed.)

Nearly eleven acres of this acreage reserve was in alfalfa. It is conceded by plaintiff that on occasions, his cattle did in fact graze on the acreage reserve. The plaintiff was not bound to conform to any specific fencing measures. The cattle were on his pasture, and escaped through his fence into the acreage reserve. The plaintiff is best in position to know what he did or failed to do to prevent the grazing of the land. He was in a position to have the best knowledge of the condition of his fences, and of his own activities. As a matter of "policy

and fairness" it would seem that the plaintiff ought to carry the burden of proving his compliance with his contract.

■ Under ordinary contract law, it is elementary that: "A party alleging performance of a contract as a basis for recovery has the burden of proof, when such fact is put in issue." 17 C.J.S. Contracts § 590. Cf. Wilkie v. Banse, 1958, 166 Neb. 138, 88 N.W.2d 181. While this Court is aware that this is not a simple civil contract case, the plaintiff here is in much the same position as a contract plaintiff who is alleging that he performed his contract and now wants his payment.

■ Looking at the matter more in the actual context in which it arises, the plaintiff has alleged that the State Committee was in error. In analogous cases, this type of assertion has resulted in the plaintiff being required to prove what he alleges. Rule 32 of the Rules of Practice before the Tax Court, 26 U.S.C.A. (I.R.C.1954) § 7453 places the burden on a petitioner to prove that the Commissioner is in error and the Second Circuit has recently approved this rule, because the sole issue of fact was raised by the petitioner's allegation. Golbert v. Renegotiation Board, 2 Cir., 1958, 254 F.2d 416, 417. This position is further strengthened by the case of Pittsburgh S. S. Co. v. Brown, 7 Cir., 1948, 171 F.2d 175. In that case a compensation claimant had gotten an award under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 921(b). The employer brought an action to restrain the enforcement of the award. Under applicable law, this entitled the employer to a trial *de novo* on the question of whether the deceased had lost his life as the result of an accidental injury occurring upon the Calumet River. The District Court said that since the burden of proof was upon the claimant in the original proceedings, it remained on the claimant defendant in the trial *de novo*. The Circuit Court reversed. In language applicable here, the Court stated:

"[T]he statutory proceeding for injunction was instituted by the plaintiff as a separate and independent action and a trial de novo was ordered upon its request for a 'new, separate and complete trial before this court.' Under such circumstances, we are unable to discern any logical reason why the defendants should carry the burden of disproving what the plaintiff alleged as a basis for the relief sought. It is not a matter of shifting the burden of proof, as the lower court suggested, but of placing it upon the party who sought relief and at whose request a trial de novo was awarded. It is our judgment that the burden of proof was upon the plaintiff, and we so hold." Id. at page 179.

Thus, if the Court considers plaintiff as suing on his contract, and alleging the performance thereof, he has the burden of proving he was not grossly negligent, in the admitted grazing of the land. If the Court considers this in the sense of a trial of whether the State Committee was in error, it is incumbent on plaintiff to prove the error in order to win; in other words to prove he was not grossly negligent. For these reasons, and for the basic reason that plaintiff is best in position to know what he did, the Court determines that the plaintiff has the burden of proving that the grazing which constituted a breach of contract, was not the result of his gross negligence.

It appears that the Otoe County ASC Committee had been hearing during the summer of 1957, that someone was grazing cattle on the acreage reserve or soil bank, but that they had heard no name. On October 8, 1957 the Committee received an anonymous postal card (Exhibit 4) stating:

"Howard Ballensperger (sic) has been pastyre (sic) his cattle all summer on the soil Bank".

Upon receipt of this card, certain members and employees of the Otoe County ASC Committee drove past the field or inspected parts of it.

Mr. Haydon Duncan, Jr. was in 1957 an assistant compliance supervisor of the Otoe County ASC Committee. He

saw cattle grazing on plaintiff's acreage reserve on four different occasions. He was sent once to check, and found cattle grazing. Two days later, he rechecked and again found such grazing. On the other two occasions, he had not been officially sent, but had noticed the cattle while driving past the farm. The official trips were around the 10th or 11th of October, 1957. One of the casual observances of the cattle grazing occurred about the 18th day of that month and year, and the fourth occasion was at some time prior to the 18th, but the date was not fixed. This witness did not inspect the fence or field.

A few days after receipt of the card, Mr. Fred Gray, office manager of the Otoe County ASC Committee looked over the southwest corner of the field in question. He found the alfalfa about half grazed off and estimated, after proper qualification, that the state of the alfalfa was such that 7 cows and 7 calves (the cattle in plaintiff's adjoining pasture) would have had to have grazed this 10.8 acres for about 10 days prior to this inspection for it to be in the condition it was. He found "quite evident" paths where the cows had walked in this corner of the field. He did not inspect the fence nor the remainder of the field.

Mr. Edo Boettcher was the Otoe County ASC chairman in 1957–1958. Mr. Elmer Moss was a member of the committee after October 1, 1957. Mr. Dexter Patton was vice chairman of the committee in 1957–1958. All three of these men visited with the plaintiff at his farm, and visited the acreage reserve. They stated that there were paths through the alfalfa where the cattle had walked, and that manure was visible. They found where one of the wires of the two-strand fence was loose over a ravine, and that there was a heavy path where the cattle had crossed from the pasture into the acreage reserve. Mr. Moss stated that 7 cattle and 6 or 7 calves (1 calf died of bloat from the alfalfa) would have had to have grazed the alfalfa about ten days to find it in the condition it was in. Boettcher and Patton did not fix a definite time, but said that it must have been grazed a "considerable time". Mr. Robert Webb, an employee of the State ASC Committee reported that at the March 1958 hearing, the plaintiff said the cattle may have been on the land two weeks altogether.

Boettcher, Moss and Patton related that in substance the plaintiff had told them he knew the fence was bad and that his cattle were in, but that he just hadn't fixed the fences. The reason these witnesses report as given by plaintiff was that since he had adequate pasture, he didn't need to fix the fence. Plaintiff denies making such a statement. The Court recognizes that the statement does not recommend itself as a logical explanation of why one would neglect to fix his fence, but all three of these witnesses repeated the substance of such an admission by plaintiff.

The fence which separated the pasture from the acreage reserve was a two strand fence constructed in 1952. There were wooden corner posts and steel posts between. The steel posts, by plaintiff's own admission, were from two to four rods apart. While certainly not conclusive in this case, it may be noted that a "lawful" wire fence in Nebraska, for division line purposes, must have four wires. The posts must be no further than one rod from each other, and there must be a stake or post between every post, to which the wire must be attached. § 34–115, R.R.S.1943. The witness Moss, who has farmed and raised cattle about forty years, stated that most pastures have a three or four wire fence. This fence above described was in the nature of a temporary fence although plaintiff calls it a permanent one. Even if the Court adopts the view that it was a permanent fence, the Judge of this court, raised in a cattle country, will almost take judicial notice of the fact that a two-wire fence with posts four rods apart or even two rods apart, which is the minimum distance plaintiff claims, is not a good pasture fence, and so finds.

There was a creek between the pasture and acreage reserve, which creek lay in

a rather deep ravine. The plaintiff appeared to lay some stress on the existence of this ravine as a natural barrier to the cattle getting in. It appeared that this creek was easily forded, being usually about three to five feet wide and three to four inches deep. It further appears that in 1946 the plaintiff had the steep banks graded down in three places so that the cattle could get to water from the pasture. Thus, the cattle were at a number of places able to get to the fence separating the pasture from the acreage reserve.

Plaintiff stated that he was first told by a neighbor that his cattle were in the reserve in August of 1957. He found that his cows had come up a gully under the fence and, as he believed, were along the division fence between his and a neighbor's land in quest of the neighbor's bull. Plaintiff came up as soon as he learned of the incident, chased the cattle out, and repaired the fence.

Then, in September, this same neighbor called to report that plaintiff's cattle were in the reserve. Plaintiff was then out of town. When he returned, two days later, he went to the acreage reserve and found the wires had been broken "as if" the cattle had been run through by dogs. He spliced the wires.

In October, he was notified by the ASC committee that his cattle were on the reserve, and on checking he found that a corner post had been washed out by recent heavy rains. He repaired this. He claims that he knew of no other time when the cattle were on the reserve. It is to be observed also that he had done no checking on his cattle following this heavy rain.

The plaintiff lives about two miles from this acreage reserve and pasture, and hence could not see the area from his home. It does not appear how often the plaintiff regularly visited the area. It does appear that between October 15th, when plaintiff was notified his cattle were on the reserve, and fixed the fence, and November 15th, when the committee visited the area, that plaintiff had

not been on the land. He claims that the committee did not point out the loose wire which their inspection revealed. It also appears that the plaintiff lost a calf by bloat, due to eating alfalfa on the acreage reserve.

■ The Secretary in his regulations has adopted the test of gross negligence. No further definition is given. No construction of this regulation has been called to the Court's attention, and none has been found. There are, of course, a multitude of definitions from other sources, but the Court deems them not particularly helpful, except as generalities. Certainly Nebraska negligence definitions are not binding. Neither are they helpful. Almost entirely they have been given or used in cases involving the Nebraska comparative negligence statute. It is to be observed that the regulations provide more severe penalties for "willful" grazing of soil bank reserve than were inflicted on plaintiff. The Court therefore believes that the term "gross" as used in the regulations does not include wilfulness as an element and implies something less than a reckless disregard of the probable consequences, but at the same time is intended to require something more than ordinary negligence. The Court determines that this gross negligence must mean the failure to exercise slight diligence, or the absence of slight care in the performance of a duty. This test concerns a degree of inattention which exceeds that necessary to find ordinary negligence. In other words, it is not enough that plaintiff was negligent. The question is to be resolved by determining whether what he did showed the absence of even slight care.

Plaintiff has not shown how often he may have checked on this land or his cattle. By his own evidence, he appears only to have chased out his cattle and fixed his fences when a neighbor or the local committee told him about the circumstances. He only used a two-wire fence, with the posts at distances quite far apart, when a three or four wire

fence is common for pastures. His cattle were in on a number of occasions. They were not in merely overnight or until plaintiff returned home from a trip, but on occasion were in for days at a time. It is well established that they were in the alfalfa long enough to establish well-worn paths in the field. Three substantial citizens, in whose verity the Court places great reliance, testified in substance that plaintiff admitted that he knew that his fences were such that the cattle were getting in, and two say he said he hadn't taken the time to fix the fence.

The Court feels that the evidence in this case is of the type and amount that if this was a jury action it would necessitate submitting the evidence to a jury to determine whether plaintiff's action amounted to gross negligence. The matter of the burden of proof thus becomes controlling even in a trial *de novo*. The Court believes, as indicated, that there was sufficient evidence from which the various committees could find, as they did, gross negligence on the part of plaintiff. The Court places great weight on the fact that plaintiff did nothing to check on the cattle or pasture except when complaint was made. After what he said was a heavy rain that washed out a corner post, he made no investigation until his neighbor called him. After the last complaint, he left the two gates to the roads open so the cattle would go on out of the alfalfa. This indicates that he was not making any real effort to keep the cattle off the alfalfa in the first instance. Of necessity, cattle would graze on the alfalfa even if the gates were open en route to the roadway. The penalty is severe, as the Court recognizes. However, the local committees who could have determined the value of the pasturage and deducted it from the payment, chose not to do so. The burden of proof being on plaintiff, as hereinabove determined, it is the opinion of the Court that the plaintiff has not sustained the burden of proving "that the State Committee erred in finding that said acreage reserve was grazed as a result of his gross negligence."

An appropriate order will this day be entered.